___

**SO ORDERED,**

*/s/ Neil P. Olack*

**Judge Neil P. Olack**
**United States Bankruptcy Judge**
**Date Signed: November 19, 2019**

The Order of the Court is set forth below. The docket reflects the date entered.
___

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**

IN RE:

    LILLIE M. GRAVES,                                              CASE NO. 19-01345-NPO

    DEBTOR.                                                                CHAPTER 13

## MEMORANDUM OPINION AND ORDER
## REGARDING OBJECTION TO CONFIRMATION

This matter came before the Court for hearing on October 18, 2019 (the "Hearing"), on the Objection to Confirmation (the "Claim #9 Objection") (Dkt. 20) filed by U.S. Bank National Association, as Trustee, successor in interest to Bank of America, National Association, as Trustee, successor by merger to LaSalle Bank National Association, as Trustee for Merrill Lynch Mortgage Investors Trust, Mortgage Loan Asset-Backed Certificates, Series 2006-RM1, by Nationstar Mortgage LLC d/b/a Mr. Cooper, its servicing agent (the "Bank") in the above-referenced bankruptcy case (the "Bankruptcy Case"). At the Hearing, Karen A. Maxcy represented the Bank, Adam Sanford represented the debtor, Lillie M. Graves (the "Debtor"), and Joshua Lawhorn represented Harold J. Barkley, Jr., the chapter 13 trustee. At issue in this contested matter is the proper valuation of the Debtor's home.[1]  At the Hearing, Kenneth M. Williams ("Williams")

---

[1] In this Opinion, the Court takes no position regarding the substantive merits of the Debtor's avoidance claim under 11 U.S.C. § 506(d) or the proper procedure for obtaining such relief.

Page 1 of 16

testified on behalf of the Bank, and Kenneth Blake Adcock ("Adcock") testified on behalf of the Debtor. Both Williams and Adcock are Mississippi-certified real estate appraisers, and both prepared written appraisal reports that were introduced into evidence at the Hearing without objection.[2] After fully considering the matter, the Court finds as follows:[3]

## Jurisdiction

This Court has jurisdiction over the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), and (L). Notice of the Hearing was proper under the circumstances.

## Facts

On April 8, 2019, the Debtor filed a voluntary petition for relief (the "Petition") (Dkt. 1) under chapter 13 of the U.S. Bankruptcy Code (the "Code").[4] The schedules that accompanied the Petition (the "Schedules") (Dkt. 4) indicate that the Debtor has an interest in real property located as 1235 Greenbriar Street in Jackson, Mississippi (the "Residence") and that the Residence is encumbered by two mortgages[5] securing separate loans owed to the Bank. (Dkt. 4 at 12). The Schedules further reflect that the Bank is the current holder of both mortgages. The Debtor lists

---

[2] Hereinafter, the appraisal report introduced into evidence at the Hearing by Bank is cited as "(W. Appr. __)", and the appraisal report introduced into evidence at the Hearing by the Debtor is cited as "(A. Appr. __)".

[3] The Court makes the following findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.

[4] Hereinafter, all code sections refer to the Code found at Title 11 of the United States Code, unless otherwise noted.

[5] A deed of trust is distinct from a mortgage, but the parties use the terms interchangeably and the Court does the same in this Opinion.

the balance owed on the "First Mortgage" as $77,427.00, and on the "Second Mortgage" as $20,879.00.[6] *Id.*

Also accompanying the Petition was the Chapter 13 Plan and Motions for Valuation and Lien Avoidance (the "Plan") (Dkt. 2) in which the Debtor proposes to continue paying the First Mortgage on the Residence in the amount of $1,048.00 per month. As to the Second Mortgage, she proposes to file an adversary proceeding to avoid or "strip the second mortgage" held by the Bank. Apparently, the Debtor treats the Second Mortgage this way because of her belief that the second loan is wholly unsecured. The Plan proposes to pay $178.00 bi-weekly to the chapter 13 trustee for distribution over 60 months of the following amounts: $500.00 to the Internal Revenue Service for payment of its priority claim; $3,585.00 for payment of attorney's fees; and $15,000.00, plus interest at the rate of 6.75% per annum, for payment of a claim secured by a 2015 Chevrolet Impala. The Plan does not propose to make any payments to the Debtor's unsecured creditors.

The Bank filed two proofs of claim in the Bankruptcy Case. On April 30, 2019, the Bank filed a proof of claim in the amount of $76,931.91 (Claim #2) (Cl. #2-1) for money loaned to the Debtor and her now deceased spouse, John W. Graves ("John Graves"), in the amount of $96,000.00 (the "First Loan") at an initial interest rate of 7.590% per annum. The Bank listed a pre-petition arrearage of $2,153.13 owed by the Debtor. (*Id.*). Attached to Claim #2 is a copy of the Adjustable Rate Note (the "Adjustable Rate Note") (Cl. #2 at 37-39) dated December 2, 2005

---

[6] The Court refers to the Bank's lien on the Residence as two mortgages—a First Mortgage and a Second Mortgage—only because the parties do so. However, "[w]hen people speak of a 'first mortgage' or a 'second mortgage,' they are usually referring to deeds of trust." K.F. Boackle, MISS. REAL ESTATE CONTRACTS & CLOSINGS § 4.55 (2d ed.). Here, there appears to be only one deed of trust securing two loans.

and the Deed of Trust (the "Deed of Trust") (Cl. #2 at 17-36) also dated December 2, 2005. The Deed of Trust refers specifically to the Adjustable Rate Note or the First Loan.

On June 11, 2019, the Bank filed a second proof of claim in the amount of $21,093.32 for money loaned to the Debtor and John Graves in the amount of $24,000.00 (the "Second Loan") at a fixed interest rate of 11.5% per annum ("Claim #9") (Cl. #9-1). The Bank listed a prepetition arrearage of $237.67 owed by the Debtor. Attached to Claim #9 is a copy of the Note with Balloon Payment (the "Balloon Note") (Cl. #9 at 26-27) dated December 2, 2005 and a copy of the same Deed of Trust attached to Claim #2. The Deed of Trust does not refer to the Balloon Note or the Second Loan.

On May 14, 2019, the Bank filed the Objection to Confirmation ("Claim #2 Objection") (Dkt. 19) urging the Court not to confirm the Plan on the ground that the Debtor failed to provide for payment of the Bank's prepetition arrearage claim of $2,153.13 owed on the First Loan. On that same date, the Bank filed Claim #9 Objection, arguing that the Plan violates § 1322(c)(2) by proposing to "strip the lien" because the Bank "believes that there is sufficient equity in the property to secure this lien." (Dkt. 20 at 1). The Bank also challenged the Plan on the ground it failed to provide payment for the Bank's pre-petition arrearage claim of $237.67 on the Second Mortgage.

On July 3, 2019, the Debtor filed an amended plan (the "Amended Plan") (Dkt. 35) to clarify the treatment of the claim secured by the 2015 Chevrolet Impala. Also, the Debtor resolved Claim #2 Objection by agreeing to pay the arrearage on the First Loan through the Amended Plan. (Dkt. 38).

After the Hearing, the parties indicated that they wanted to discuss a resolution of Claim #9 Objection without further Court intervention. The Court gave the parties a deadline of October

25, 2019 to settle their dispute. On that date, counsel for the parties informed the Courtroom Deputy that they were unable to reach a settlement.

Subsequently, the parties submitted the Agreed Order (the "Agreed Order") (Dkt. 56), which the Court entered confirming the Amended Plan while reserving the Claim #9 Objection for later decision. The Agreed Order provides that if the Court sustains Claim #9 Objection, the Debtor must modify the Amended Plan to provide for "proper treatment" of the Second Mortgage within fourteen (14) days. If the Court overrules Claim #9 Objection, the Debtor must file the "necessary adversary proceeding" within one (1) year. (Dkt. 56). The Agreed Order also provides that the Debtor's failure to take either action in a timely manner could result in the dismissal of the Bankruptcy Case without further notice.

**Discussion**

According to the parties, the proper treatment of the Bank's Second Mortgage in the Amended Plan depends on the value of the Residence. Under § 506(a), "an allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim." 11 U.S.C. § 506(a). A claim secured by a junior lien, therefore, is secured only to the extent the value of the property to which the junior lien attaches exceeds the amount of any senior lien as determined under the § 506 "cramdown" provision. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 239 (1989).

In a chapter 13 case, however, § 1322(b) prohibits the modification of any claim that is "secured only by a security interest in real property that is the debtor's principal residence." 11 U.S.C. § 1322(b)(2). The United States Supreme Court has construed § 1322(b) as prohibiting the

bifurcation of an under-secured home mortgage into its secured and unsecured portions. *Nobelman v. Am. Savs. Bank*, 508 U.S. 324, 327 (1993) (holding that § 1322(b)(2)'s anti-modification provision protects the entire home mortgage). But if the deed of trust or mortgage on a principal residence is a junior lien and the value of the collateral securing the junior lien is less than the amount owed on the senior lien, the junior lien is wholly unsecured. In that event, the Fifth Circuit Court of Appeals has held that the junior lien is not protected by § 1322(b)(2) and may be modified. *Bartee v. Tara Colony Homeowners Ass'n (In re Bartee)*, 212 F.3d 277, 291 (5th Cir. 2000) (holding that *Nobelman* does not extend the protection afforded home mortgages by § 1322(b)(2) to wholly unsecured second liens or mortgages).

The Bank does not dispute the above summary of the law but does dispute that the value of the Residence is less than the balance of the First Mortgage. Thus, the sole issue before the Court, as framed by the parties, is a determination of the value of the Residence under § 506(a)(1). If the value of the Residence is equal to or less than the debt owed on the First Mortgage, then the Bank will be left with a wholly unsecured claim as to the Second Mortgage and the Amended Plan as confirmed requires no modification. Conversely, if the Residence is worth more than the debt owed on the First Mortgage, even if by $1.00, then the Bank's Second Mortgage cannot be modified pursuant to § 1322(b)(2) and the Debtor must modify the Amended Plan to provide for payment of the Second Mortgage as a fully secured claim. According to the proofs of claim filed by the Bank, the amount owed on the Petition date on the First Mortgage was $76,931.91 and on the Second Mortgage was $21,093.32.

The Court questions whether the parties' assumption that the Residence is encumbered by a Second Mortgage is correct under these facts where there are two loans but only one Deed of Trust. The parties may not have considered this issue. In this Opinion, therefore, the Court

addresses only the valuation of the Residence and leaves to another day the proper treatment of the Balloon Note in the Amended Plan after additional briefing by the parties.

The valuation of assets is not an exact science. *In re Brown*, 289 B.R. 235, 238 (Bankr. M.D. Fla. 2003). Bankruptcy courts determine valuation questions by considering the purpose of the valuation and reviewing the facts and circumstances of each case. *See Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 799 (5th Cir. 1997). Importantly, "[t]he bankruptcy court is not bound by valuation opinions or reports submitted by appraisers, and may form its own opinion as to the value of property in bankruptcy proceedings." *In re The Grind Coffee & Nosh, LLC*, No. 11-50011-KMS, 2011 WL 1301357, at *6 (Bankr. S.D. Miss. Apr. 4, 2011).

For purposes of determining the value of real property, the Court finds that April 8, 2019, the date of the Petition, is the relevant date. *Chase Manhattan Bank USA NA v. Stembridge (In re Stembridge)*, 394 F.3d 383, 387 (5th Cir. 2004). Neither party has asked the Court to use a different valuation date. Also, the Court finds that in the context of a chapter 13 plan confirmation, the burden of proof under § 506(a) is on the debtor to demonstrate valuation by a preponderance of the evidence. Keith M. Lundin & William H. Brown, CHAPTER 13 BANKRUPTCY § 217.1 (4th ed. 2004). Under this standard, the Debtor has the burden of proving by a preponderance of the evidence that the Residence, which she intends to retain, is equal to or worth less than the amount owed the Bank under the Second Mortgage.

At the Hearing, each party presented the testimony of a Mississippi-certified real estate appraiser as to the valuation of the Residence. Both witnesses qualified as experts for valuing residential properties, and both experts adopted the sales comparable approach as the most reliable method for determining the fair market value of the Residence. (A. Appr. at 5; W. Appr. at 6).

They reviewed the sales prices of recently sold homes located in the same neighborhood as the Residence that they considered to be comparable in size, quality, and condition. Because none of the homes chosen was identical to the Residence, both appraisers adjusted the sales prices to reflect differences in lot size, square footage, condition, and other characteristics.

As described in both appraisal reports, the Residence is a one-story, single-family, ranch-style home built 47 years ago in 1972 and located in a subdivision of similarly-constructed homes. (A. Appr. at 3-4; W. Appr. at 6). The Residence has living space of approximately 1,675 square feet, including three bedrooms and two full bathrooms. The living room features a fireplace. Attached to the Residence is a two-car garage, a storage room, and a covered patio. The Residence has not been renovated or remodeled for many years. Both appraisers included photographs of the interior and exterior of the Residence in their appraisal reports. (A. Appr. at 16-25; W. Appr. at 19-30).

The Debtor's expert, Adcock, submitted an appraisal report valuing the Residence "as is" at $65,000.00 as of July 11, 2019, approximately three months after the Petition date. (A. Apr. at 2). The Bank's expert, Williams, submitted an appraisal report valuing the Residence "as is" at $104,000.00 as of August 17, 2019, approximately four months after the Petition date. Adcock rated the condition of the Residence as "poor to fair" (A. Appr. at 4); whereas Williams rated the condition of the Residence as "C4," defined as a property in need of "minor deferred maintenance." (W. Appr. at 6, 15). With respect to their sales comparison analysis, there were several significant differences. Although both Adcock and Williams acknowledged that there were deferred maintenance issues with the Residence, Adcock viewed those maintenance issues to be so significant that he considered the sale of property acquired by a lender in a foreclosure to be the most comparable sale for his appraisal. Although he included in his appraisal report two other

conventional sales of homes that he viewed as similar to the Residence and had not been remodeled or updated, he did not consider those sales prices in his analysis. Williams, in contrast, testified that he did not include any foreclosure sales in his analysis since he did not believe that those sales accurately reflected fair market value. For his appraisal, Williams selected three homes of similar age and quality that he viewed as similar to the Residence, but unlike the Residence, the homes had been updated. The $39,000.00 difference between their valuations of the Residence raises two issues: (1) whether an appraisal based on foreclosure sales is a reliable indicator of fair market value and (2) whether an appraisal based on non-foreclosure sales of homes lacking any material upgrades is a reliable indicator of fair market value.

**A.     Adcock's $65,000.00 Valuation**

For his analysis, Adcock selected three (3) ranch-style homes in the same neighborhood as the Residence that were sold between December 2018 and March 2019. (A. Appr. at 4). The first sale was a "CASH-REO" sale in the amount of $62,100.00. An "REO" or "real estate owned" sale refers to property acquired by a lender usually as a result of a foreclosure. *Real Estate Owned*, BLACK'S LAW DICTIONARY (10th ed. 2014). This home was built in 1962 with a living area of 1,702 square feet, a carport, and an uncovered patio. Adcock adjusted the $62,100.00 sales price upwards by $3,500.00 to account for the smaller lot size and the lack of either a covered patio or two-car garage and downwards by $540.00 to account for the additional living area for a final adjusted sales price of $65,060.00.

The second and third sales were "arm's length" sales in the amounts of $106,500.00 and $110,000.00, which Adcock adjusted downwards by $40,000.00 to account for their "superior" condition. He made other adjustments as well. He adjusted the sales prices downwards by $2,000.00 to account for a front porch and upwards by $1,000.00 because the homes lacked a

covered patio. To account for differences in the living area, he adjusted the second comparable upwards by $3,460.00 and the third comparable downwards by $4,460.00. The final adjusted sale prices were $68,960.00 and $64,540.00.

In his valuation, Adcock relied largely on the foreclosure sale because he found the condition of that home to be "poor to fair," the same rating he assigned the condition of the Residence, and thus made no adjustments to the sales price based on condition. He viewed the second and third sales as less comparable than the foreclosure sale because he applied a $40,000.00 downward adjustment to the prices to account for their "superior condition." Otherwise, the homes were similar in age, square footage, and location, and, like the Residence, they lacked any updates.

Adcock testified that during his visual inspection of the exterior of the Residence, he observed major foundation problems. He found cracks along the right exterior brick wall, the size of which indicated more than normal foundation settling. (A. Appr. at 22). He noted that two large trees growing near the Residence could be the source of plumbing problems in the Residence. (A. Appr. at 23). He described the roof as being in fair condition but observed that the flashing next to the chimney had become loose and the soffit and fascia near the chimney had rotted. (A. Appr. at 20). A large portion of the backyard wooden fence had collapsed. (A. Appr. at 25).

His visual inspection of the interior of the Residence confirmed the likelihood of major foundation problems. He found cracks in the drywall and the ceiling in the hallway and dining room. (A. Appr. at 22). Some doors of the Residence swung to one side when opened. The floor was uneven. There were gaps between the floor and some walls. The doors on the kitchen cabinets leaned to one side.

He found other deferred maintenance issues unrelated to the foundation problems. Pipes were leaking, which indicated a plumbing problem, possibly caused by the roots of the large trees

near the Residence. (A. Appr. at 21). Some of the vinyl floor covering was missing. (A. Appr. at 22). Some wall sockets were inoperable, as demonstrated by the presence of power cords running through some of the rooms. In the master bathroom, electrical wires hung loose from the ceiling where a fluorescent fixture had once been. (A. Appr. at 22). The lights in the kitchen flickered, and he saw sparks emitting from the electrical panel in the storage room. A large section of the ceiling in the garage was missing. There was a large hole in the drywall in the storage room.

In the appraisal report, he estimated the total cost of necessary repairs to be $40,000.00, which he itemized in the chart below:

REPAIRS WITH ESTIMATED COSTS

| DESCRIPTION | AMOUNT |
|---|---|
| FOUNDATION REPAIR | 12,500 |
| ELECTRICAL AND PLUMBING REPAIR(INCLUDING FIXTURES) | 3,000 |
| ROTTEN WOOD(EXTERIOR) REAPIR & REPAINT | 2,500 |
| REPAIR SHEETOCK AND REPAINT | 2,500 |
| REPLACE/REPAIR ATTIC DROPSTAIRS | 250 |
| REPLACE GARAGE DOOR AND REPLACE ARAGE DOOR OPENER | 2,000 |
| INSTALL MISSING FLOOR COVERING | 1,000 |
| TREE REMOVAL(FRONT TREES TOO CLOSE TO HOUSE) | 2,500 |
| GENERAL CLEAN-UP (INTERIOR AND YARD) | 1,500 |
| REPAIR FENCE | 250 |
| UNSEEN ITEMS, GENERAL | 2,000 |
| ENTREPRENURIAL PROFIT | 10,000 |

| | | |
|---|---|---|
| [X] Interior Inspection | TOTAL AMOUNT OF RECOMMENDED REPAIRS $ | 40,000 |
| [X] Exterior Inspection | ESTIMATED VALUE OF THE SUBJECT PROPERTY 'AS IS' $ | 65,000 |
| | ESTIMATED VALUE OF THE SUBJECT PROPERTY 'AS REPAIRED' $ | 105,000 |

(A. Appr. at 8). The descriptions of repairs in the above chart are self-explanatory with the exception of the "entrepreneurial profit" of $10,000.00, which he listed as a separate line item. At the Hearing, he explained that he believed that the mostly likely buyer of the Residence would be an investor who would not purchase the Residence unless there was a potential sales profit of at least $10,000.00.

In addition to "major or deferred maintenance" issues, he noted in the appraisal report that the Residence "is 'dated' significantly and does not appear to have had any significant updates

Page 11 of 16

with in the last 20 years or so." (A. Appr. at 7). He testified that he disagreed with Williams' choice of comparable sales because the homes had been updated.

**B.       Williams' $104,000.00 Valuation**

For his analysis, Williams selected three ranch-style homes in the same neighborhood as the Residence that were sold between October 2018 and July 2019. (W. Appr. at 6). These homes sold for $129,000.00, $128,000.00, and $120,000.00 and had been renovated or remodeled. Williams applied a twenty percent (20%) downward adjustment to all three sales to account for differences in condition. He adjusted the sales prices for other differences, including the size of the living spaces, before he arrived at comparable adjusted sales prices of $100,300.00, $104,550.00, and $107,400.00, respectively. He made no adjustment, however, for the absence of any updates in the Residence. Williams placed more weight on the first sale at an adjusted price of $100,300.00 because he found the condition of that home to be the most similar to the condition of the Residence. He arrived at his valuation of $104,000.00 by averaging the sales prices.

All of the sales in his analysis were open market sales. He testified that he had been instructed by the Bank not to use distressed sales in his appraisal and disagreed with Adcock's inclusion of the foreclosure sale in his appraisal report.

During his visual inspection of the Residence, Williams found many of the same maintenance issues that Adcock had noted in his appraisal report. (W. Appr. at 11). Williams observed cracks in the drywall and ceiling in the hall and dining room as the result of "foundation failure." (*Id.*). He saw that the soffit and fascia around the chimney had rotted. He estimated that thirty to forty percent (30%-40%) of the ceiling in the garage had collapsed. He heard hissing noises from the electrical panel in the storage room and noted that the lights in the kitchen flickered. He noticed that the bulb was missing from the fluorescent fixture in the master bathroom

and believed the ballast was defective. He did not detect any plumbing problems but saw that some plumbing repairs had been performed in the utility area where a rectangular hole in the drywall remained. The stairs to the attic were non-functional. A board propped up the door to the overhead attic to keep the pull-down ladder from falling. The garage door did not function. A ten (10)-foot section of the backyard wooden fence was missing.

In his appraisal report, he estimated the total cost of repairs at a range of $15,000.00 to $20,000.00. (W. Appr. at 11). He did not itemize the repair costs in his appraisal report. At the Hearing, however, he estimated the cost to repair the foundation at $15,000.00 and the cost of the remaining repairs at $10,000.00 for a total repair cost of $25,000.00. He agreed that his estimate for repairs was conservative.

He testified that the Residence had not been updated for many years. He admitted that all three sales in the appraisal report involved homes that unlike the Residence, had been remodeled or updated, but he testified that the fair market value of the Residence would be close to the actual sale prices of these homes with the necessary repairs.

C.    Valuation Analysis

Adcock relied largely on a foreclosure sale in reaching his opinion, but the Court finds that his choice of a foreclosure sale is inappropriate for a valuation under § 506(a) of a principal residence when the chapter 13 debtor intends to remain in her home. Section 506(a)(1) directs the Court to determine value "in light of the purpose of the valuation and of the proposed disposition or use of such property." 11 U.S.C. § 506(a)(1); *see Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 963 (1997) (holding that "actual use, rather than a foreclosure sale that will not take place, is the proper guide under a prescription hinged to the property's 'disposition or use'"). The Court finds that fair market value is the price that the Residence likely would sell for in an arm's length

transaction under conventional terms of sale.  This finding is consistent with the definition of "market value" in Adcock's appraisal report as "[t]he most probable price which a property should bring *in a competitive and open market*."  (A. Appr. at 27) (emphasis added).

Moreover, because the seller of a foreclosed home is likely to be motivated to sell for a lower price than a sale between a willing seller and a willing buyer, the Court does not consider such sales to provide reliable data of fair market value.  The bankruptcy court in *In re Serda*, 395 B.R. 450, 454-55 (Bankr. E.D. Cal. 2008), explained the different sale motivations, as follows:

> Generally, an owner-occupant will try to realize the highest and best price for her property in an open market.  Conversely, a bank-owned property is marketed to liquidate the bank's inventory of foreclosed properties and minimize the bank's losses in a time of economic stress. . . .  A bank simply does not have the same incentive to market a foreclosed property as patiently as an owner-occupant, or to necessarily realize the highest and best price.

*Id.*  Comparing the sales of similar homes sold in arm's length transactions between two willing individuals, adjusted for material differences, is the proper approach for determining the fair market value of the Residence for purposes of § 506(a)(1) and § 1322(b)(2).  *See Hernandez v. TCF Banking & Savs. (In re Hernandez)*, 493 B.R. 46 (Bankr. N.D. Ill. 2013); *In re Williams*, 480 B.R. 813 (Bankr. E.D. Tenn. 2012); *In re Strever*, 468 B.R. 776 (Bankr. D.S.C. 2012); *In re Duncan*, No. 08-8808AJM3, 2008 WL 5333561 (Bankr. S.D. Ind. Dec. 17, 2008).  The Court, therefore, finds that Adcock's appraisal of $65,000.00, which he based on the foreclosure sale, understates the fair market value of the Residence.

With respect to the second and third comparables used by Adcock in his analysis, which were not foreclosure sales, the Court disagrees with his downward adjustment of the sales prices for an entrepreneurial profit of $10,000.00.  There was insufficient evidence to support such an adjustment, and the subject matter appeared to be outside the scope of Adcock's area of expertise.  Because the Debtor intends to remain in the Residence, the Court finds it inappropriate to deduct

from its fair market value an investor's expectation of profit.  When questioned by the Court at the Hearing, Adcock testified that removing the $10,000.00 downward adjustment for the entrepreneurial profit would increase the second and third comparable sales to $78,960.00 and $74,540.00.

The Court finds that with the removal of the adjustment for the entrepreneurial profit, these two comparable sales are more reliable than those chosen by Williams because they are the only ranch-style homes recently sold in arms-lengths transactions in the same neighborhood as the Residence that had not been updated.  As noted by another bankruptcy court, although the Court "may accept an appraisal in its entirety," it does not have to do so and "may choose to give weight only to those portions of an appraisal that assist the [C]ourt in its determination."  *In re The Grind Coffee & Nosh, LLC*,  2011 WL 1301357, at *6*.  Accordingly, the Court finds that the fair market value of the Residence as of the Petition date was approximately $76,750.00, an average of these two comparable sales in Adcock's appraisal.

The Court finds that William's appraisal of $104,000.00 does not establish an accurate fair market value of the Residence because all of the homes in his analysis had been remodeled.  Fair market value should be based on the sales of homes substantially similar to the Residence, but a reasonable home buyer likely would pay more for a remodeled home.  Because Williams ignored this difference in his appraisal report, there is no information available to estimate the amount of a downward adjustment to apply to each of these sales.  Moreover, the Court is concerned such adjustments would be so large as to render the homes insufficiently comparable to the Residence to reflect an accurate market value.

In addition, the Court finds that Williams' estimate of total repair costs was too low.  His testimony about the deferred maintenance issues was consistent with Adcock's but he did not

provide an itemized list of repair costs in his appraisal report. Instead, Williams provided an estimate at the Hearing of $25,000.00 that exceeded the more conservative estimate in his report of $15,000.00 to $20,000.00, and he identified only the cost to repair the foundation at $15,000.00. He did not itemize the remaining repairs but estimated the total cost to be $10,000.00. The Court finds that Adcock's estimate of $30,000.00, excluding the $10,000.00 entrepreneurial profit, more accurately reflects the total costs to repair the Residence.

## Conclusion

For the reasons previously stated, the Court finds that the fair market value of the Residence as of the Petition date was approximately $76,750.00. Because it is unclear whether the Residence is encumbered by a second lien or mortgage, the Court declines to rule on Claim #9 Objection until the parties have had an opportunity to be heard on the issue.

IT IS, THEREFORE, ORDERED that the value of the Residence as of the Petition date was $76,750.00.

IT IS FURTHER ORDERED that within twenty-one (21) days of this date of this Opinion, the parties shall file briefs addressing the facts presented here—where one Deed of Trust secures the repayment of both the Adjustable Rate Note and the Balloon Note. Is there a junior lien that is not protected by § 1322(b)(2) that is wholly unsecured and may be modified and avoided?

##END OF OPINION##